Swing, J.
Sinclair brought his action against the insurance company in the common pleas court, on a policy of insurance issued by the company, on his mill, situated at Salem, in the state of Indiana. The case was tried before a jury, and a verdict was given for the plaintiff, on which a judgment was rendered. To reverse this judgment this action is prosecuted here.
The case was stubbornly fought, and quite a number of exceptions taken to the rulings of the court, to which error is assigned, here, but in the argument counsel for plaintiff in error stated that he would claim error as to three assignments only, which errors were:
1. That the court erred in not permitting the jury to pass on. the question raised in the third defense of defendant’s answer, .which was as to whether plaintiff had used gasoline or a product of petroleum in lighting said mill, or kept the same in store on said premises; but passed on the question itself.
*497 2. That said policy of insurance was avoided by the defendants ceasing to operate the mill.
3. That by the terms of said policy the same was to become void when in the buildings insured nitro-glycerine, gun-powder, phosphorous, fire-works, naptha, benzole, benzine, gasoline, or any of the products of petroleum or coal-oil are deposited, stored or kept, or used for light on the premises, or if refined coal or earth oils or kerosene in quantities exceeding five gallons are deposited, stored or kept on the premises.
The contract sued on was a contract of insurance in the ordinary form, and with the ordinary conditions.
As to the first ground of error relied on, to-wit, that the court erred in refusing to submit to the jury the question whether the .substance used in lighting the building came within the terms of the policy, we think that we are not called upon to decide it, for the reason that we are not able to find in the bill of exceptions any exception taken at the trial to the ruling of the court on this point. We could, therefore, only consider it, if upon a consideration of the whole case we came to the conclusion that the court was wrong, not only in refusing to refer the matter to the jury, but in its conclusions upon the facts and law, and this wé are not prepared to do.
Next as to the second error relied on, that the mill ceased to be operated. The evidence shows that the mills were shut down entirely about the 1st of September, 1883, and were not operated from that time on until December 4th, 1883, at which time the mill was destroyed by fire.
It was claimed by plaintiff and conceded by defendant that the plaintiff had the right, at any time whenever it became necessary, to shut down for repairs, and this is what the plaintiff claimed he did. There was no controversy as to the law, but it was purely one of fact for the jury. The plaintiff offered evidence tending to show that repairs were necessary and that he proceeded to make the same in a judicious manner, as rapidly as it could properly be done. This was contradicted by the defendant and was the' issue of fact between the parties. Without taking up the evidence and commenting on it in detail, we may say, that we have considered it, and the result of our conclusion is, that at least we can not say that the finding *498 of the j ury on this issue is not so manifestly against the weight of the evidence as to authorize us in reversing the judgment.
The third and last ground of error relied on is as to the manner in which the building was lighted. There is no difference between the parties as to the facts about the way the building was lighted, the only question being whether it was lighted by gasoline or a product of petroleum, as claimed by defendant, or whether by gas or gasoline vapor, as claimed by plaintiff.
The building was lighted by what was known as a Coleman gas machine. Gasoline was placed in a tank under ground, thirty-five feet distant from the outside of the nearest wall of the insured building. In connection with the tank are flannel cloths and adjusted weights, and other appliances, by means of which the gasoline is easily and rapidly vaporized, and in this form forced through iron pipes, which connect with said tank, and which pipes run through all portions of the building which are to be lighted. The pipe used is the ordinary gas-pipe, and the manner of lighting and burning is similar to ordinary gas. In this way the mill was lighted.
It is claimed by defendants that the vapor produced by means of this machine was still gasoline and a product of petroleum, and that it was stored and kept in the building and used for lighting the same, and the conditions of the policy violated. To support this view, defendant called Prof. Frayne and Mr. Going, expert chemists, the substance of whose testimony is to the effect that while in common parlance it is called a gas, yet strictly and scientifically speaking it is not a gas, but gasoline. They say that a gas does not condense, whereas under proper circumstances and conditions this gasoline vapor can be condensed so as to become gasoline again, just as steam will become water. They call it atmospheric air charged with gasoline, a vapor of gasoline carried along in a current of atmospheric air, and an atmospheric air saturated with gasoline, but Prof. Frayne says that common people out of the labratory speak of it as gas. Gasoline is defined by •Webster as “a highly volatile mixture of fluid hydrocarbon, obtained from petroleum.” Worchester, as “a volatile fluid distilled from naptha.”
*499 The Encyc. Brittanica says, “ gasoline is the lightest fluid, obtained in considerable quantities, and is used in automatic gas machines for the carburation of gas or air.”
There is no question that by the word gasoline, as ordinarily understood, a fluid is meant. As an article of commerce no other idea is conveyed, it is sold in barrels and measured by the gallon.
Taking these three facts to be established, viz., that ordinarily gasoline is understood to be a fluid, that the vapor produced by this machine is {commonly called a gas, but that chemically speaking it is still gasoline held in the air in a vaporized condition, what meaning shall we give to the word gasoline as used in this contract? It is a fixed rule of construction that the words of a contract are to be understood in their general, ordinary and popular sense, unless from the circumstances and surroundings of the parties and the context of the instrument they were clearly intended to be used in a different sense. Applying this principle of law to the admitted facts, it seems clear that the thing usód in this mill for lighting was not the thing called gasoline within the meaning of the contract.
It would seem very unjust and unreasonable indeed, that a contract of insurance, which usually, I might say always (as this one was), is prepared with great care and at great length by the insurer, not as the result of any agreement between the parties, about which they had consulted, but rather in the nature of a statement of terms and conditions upon which insurance would be taken, should be governed by any other rule of interpretation. These contracts of insurance are intended and expected to be accepted by the ordinary, general average man of business, who is supposed to know the primary, common ordinary meaning of words, but who is not supposed to know their technical, hidden, secret or secondary meaning, nor is there anything in the context of the contract or anything to be gathered from its subject-matter that would lead one to believe that the words used were to have any other meaning than the one ordinarily attached to them. Clearly, to our minds, the intention of the parties to this contract was, that liquid gasoline was the gasoline that was intended to be *500 prohibited from being stored in the mill or to be used for light on the premises.
Paxton & Warrington, for plaintiff,in error.
J. P. Balwin, for defendant error.
But it is also claimed that the thing used by plaintiff was a product of petroleum. Let us apply the same rules of construction to this that we have to the word gasoline, and what are we to understand as being a product of petroleum ? Certainly the primary products of petroleum, and not its secondary or sub-products. There is no dispute as to what this vapor is. It is not a first or primary product ‘but a sub-product of petroleum. The American Encyclopedia gives as the products of retroleum, rhigoline, gasoline, naptha, kerosene, mineral sperm oil, paraffine, paraffine wax, residuum, and witnesses gave substantially the same. The sub-products of petroleum are very numerous and of various characters.
And that such was the intention of the parties, the language of the contract clearly shows. Applying the principle of Uejusdem generis,” the contract prohibits, ‘Í naptha, benzole, benzine, gasoline, or any of the products of petroleum.” Things of the same nature are intended. They are all liquids, and all first products of petroleum. They are all of the same nature, highly inflammable, and dangerous, increasing the risk- — but no evidence has been offered which tends to show that lighting the mill by this gas or vapor increased the risk. The law of our state prohibits the sale of these substances for illuminating purposes, but does not when sold to produce the gas or vapor from such oils, when they are contained in reservoirs under ground.
This manner of lighting buildings is not uncommon. It must be presumed to have been known to .the parties, and it was commonly known, not as gasoline or a product of petroleum, but as a gas, or vapor. It is not of the same nature as to form of substance, or as to its dangerous quality. It had a distinct and different meaning from the words used; this meaning was known to the parties, and if they had intended such a meaning to be attached to the words, they could easily, and should, have said so. We think the judgment of the court below was right, and it will, therefore, be affirmed.